## IN THE MATTER OF FRANK H. WOODS TRUST.

[No. 3229 (N. S.); (Old No. 23,482); February, 1915].

Trusts—Accounts of Trustee—Conclusiveness and Finality of Allowance.—A ruling by the court on a testamentary trustee's accounts, clearly contrary to the terms of the trust as defined in the final decree of distribution, and the result of a judicial inadvertence based upon the fact that at the time of the settlement of the accounts there was no controversy as to the items thereof, though final as to the contents of those accounts, is not binding upon the court in relation to subsequent accounts of the trustee. While such accounts, unchallenged at the time, are unaffected after the term for appeal therefrom has passed, yet finality as to their adjudication may not be predicated with reference to their effect upon the future. Such settlements affected only the items contained in the accounts for the period.

Trusts—Separate Accountings of Trustees—Relation One to Another.—A judgment in one proceeding cannot control judicial action, the judgment, in another and independent action or proceeding; and every separate accounting of a trustee is an independent proceeding, distinct from every other accounting, past or future.

Trusts—Agreement Affecting Income Rights of Beneficiary—Power to Make.—An agreement between the trustees of a testamentary trust and the income beneficiary, whereby the interests of the latter are to be preserved by withholding certain properties from sale at a sacrifice, and the income rights of the beneficiary increased beyond what is contemplated by the instrument creating the trust, cannot be justified on account of the unusual conditions which followed the great fire in San Francisco and which prevailed when the agreement was made, nor does it become binding upon the court because the court may seem to have accepted it in the settlement of uncontested accounts presented by the trustees.

Trusts—Net Income—What Constitutes.—Net income is "the income derived from the whole property, less the necessary expenses incurred in its management, and disbursements incurred on account thereof." It is simply "net," not "gross," income, and that is what the income beneficiary in the case at bar derived through the testamentary trust; and no former adjustment, even if not now reviewable, as to the previous accounts, although they were left to the court by the mutual consent of the then trustees of the trust and the income beneficiary, can relieve the court in the present instance of the duty of meeting the issue, for the first time presented in a seriously contested form.

**Trusts—Life Estate—Taxes—From What Property Payable.**—In the case under consideration the taxes upon the unimproved property which produces no income should be paid out of the corpus of the estate; but the ordinary taxes of property in which there is a life estate, and the ordinary expenses of the care and management of the principal, are charges upon the life estate, to be paid out of the income.

**Trusts—Life Estate—Duty to Pay Insurance—Deduction from Income.**—A life tenant is not bound to insure the interest of the remainderman, but each may insure his own interest. A trustee who holds the legal title for both has the duty of insuring; and accordingly insurance premiums paid by a trustee would probably be universally treated as an ordinary expense of holding and managing the property, and so payable out of income.

**Trusts—Administrative Expenses—Payment from Current Income.** The administrative expenses of a trust, namely, court and legal costs and expenses, office expenses and office administration and salaries, and trustees' compensation, should come out of current income.

**Trusts—Compensation of Trustee—Payment from Income.**—A trustee is entitled to a reasonable compensation for his services as they are rendered, and unless a contrary intention appears, the compensation must come out of the income of the fund in the administration of which it is earned.

**Trusts—Interest on Trust Indebtedness—How Chargeable.**—The question in this case as to the payment of the interest on the trust indebtedness, which it is proposed to charge against capital entirely, is not correctly so chargeable, for the equitable tenant for life must pay the interest upon all encumbrances upon the estate, to the extent of the rents and profits.

**Trusts—Interest on Encumbrances—Payment by Life Tenant.**—Interest on encumbrances on trust property, for example, a mortgage, must be paid by the life tenant although it would not be safe for a remainderman as against the mortgagee to rely on the liability of the life tenant to pay the interest.

**Trusts—Interest on Encumbrances—Payment from Income.**—A trustee who places encumbrance on property, or allows one to remain, should pay the interest out of the income.

**Trusts—Encumbrance on Property—Payment from Principal of Trust Fund.**—If the trustee pays off the principal of the encumbrance, he should pay it out of the principal of the trust fund of which both the life tenant and remainderman are beneficiaries.

**Trusts—Encumbrance on Property—Effect of Payment by Remainderman.**—If a remainderman pays off the encumbrance, the life tenant must continue to pay interest to the remainderman, or what is more usual, must pay to the remainderman the present worth of an annuity equal to the annual interest running during the number of years which constitutes the expectancy of life of the tenant for life.

Application for settlement of eighth, ninth, tenth, and eleventh accounts of trustees.

Harry F. Woods, Timothy J. Lyons and H. A. Hedger, trustees.

Timothy J. Lyons, for Trustees Woods and Lyons.

Edward C. Harrison, for H. A. Hedger, Trustee.

COFFEY, J. The accounting in this case embraces four trust years, July 1, 1908, to June 30, 1912, inclusive, and is presented by the trustees under section 1699, Code of Civil Procedure.

The trust was established and adjudicated by a decree of final distribution, dated June 14, 1901 (filed June 21, 1901) in this court, Department 9, in the proceeding 23,482, probate, entitled, "In the Matter of the Estate of Francis Henry Woods, also known as and called Frank H. Woods and Francis H. Woods, and F. H. Woods, Deceased." No appeal was ever taken, nor any attempt at an appeal from this decree, and it therefore became final, and it was consented to by Harry F. Woods, who was and is the sole heir at law of said decedent and testator, and the only person who could have objected to said decree to which he expressly consented, as is recited by the court therein. In and by that decree all the residue of the estate of the decedent testator, after payment of said legacies, was distributed to Harry F. Woods, Edward Barry, Timothy J. Lyons and C. G. Minifie, and their successors in the trust, as trustees upon the trust, and for the uses and purposes set forth in said decree. That immediately upon

the entry of said decree the property distributed thereunder to the said four trustees was delivered to and taken possession of by them as such trustees, and pursuant to and in acceptance of the trusts declared by said decree, whereupon the said trustees entered upon and in the performance and discharge of their duties as such trustees and the administration of said trust, and continued therein until the resignation of the said C. G. Minifie as one of said trustees and the appointment (by order dated October 21, 1904) in his place of S. B. Cushing, by this court in the above proceeding (the first of the three "successors or alternates" in trust, as adjudicated in the aforesaid decree of final distribution) following which appointment and the qualification of said Cushing as a trustee, the administration of said trust was carried on and performed by said Harry F. Woods, Edward Barry, Timothy J. Lyons, and S. B. Cushing, as trustees of said trust, until the death of the trustee Edward Barry on September 23, 1909 (except that from the date May 17, 1909, the three trustees, Harry F. Woods, and Edward Barry and Timothy J. Lyons alone acted as trustees, under order of this court of said date, May 17, 1909, the trustee, S. B. Cushing, being unable to act, by reason of sickness). That one week subsequent to the death of said Edward Barry, the trustee S. B. Cushing died, to wit, on September 30, 1909. That thereafter, the remaining trustees, Harry F. Woods and Timothy J. Lyons, presented to this court their petition in the above-entitled proceeding (dated October 5, 1909, and filed herein October 6, 1909), praying for the induction of the second "successor or alternate" in the trust, as named and adjudged in the aforesaid decree of final distribution, namely H. A. Hedger, and further praying that the court further adjudge the membership of the trust, and setting forth and alleging in that behalf that the third "successor or alternate" in the trust, as named and adjudged in said decree of final distribution (following the will of the trustor), namely, George F. Bowman, had "died in the lifetime of the trustor Frank H. Woods," and that "the membership of the trustees of said Frank H. Woods

Trust consisted of three persons only, namely, Harry F. Woods, Timothy J. Lyons and H. A. Hedger''; annexed to which petition the said H. A. Hedger certified to the court in writing his ''willingness, consent and desire to act as one of the trustees of the aforesaid Frank H. Woods Trust, pursuant to my right and title set forth in the foregoing petition.'' Thereafter, due proceedings being had, the said H. A. Hedger was inducted into the office of trustee in pursuance of said petition, and has ever since acted as such in association with the surviving original trustees, Harry F. Woods and Timothy J. Lyons; and these three now constitute the trustees of the trust created by the will of the decedent trustor, which trust, as adjudicated by the decree of final distribution in clause sixth is as follows: That as to all the rest and residue of the property and estate of the aforesaid decedent and testator, Francis Henry Woods (also known as and called Frank H. Woods and Francis H. Woods, and F. H. Woods), which rest and residue are hereinafter particularly described, and also any and all other property, estate, rights and claims of said decedent and testator, if any such there be, not now known or discovered, the same and every part thereof, are hereby distributed, in accordance with the last will, and codicils thereto, of said decedent and testator, unto Harry F. Woods and Edward Barry, and Charles G. Minifie and Timothy J. Lyons, as trustees (and their successors or alternates in the trust), in trust, however, upon and for the following uses and purposes, that is to say:

(A) To receive the rents and profits of the real property, and to receive the rents, issues, profits and income of said real property and of the personal property; and also, as hereinafter provided, to accumulate the rents, issues, profits and income of both the real and personal property; and also, to pay to or apply to the use of Harry F. Woods, out of the principal or capital of the personal property, such amount or amounts as hereinafter provided.

(B) To pay to or apply to the use of Harry F. Woods, aforesaid, the son of testator, for and during the term of his

natural life, monthly and at other periods, the entire net amount of the rents, issues, profits and income of said real and personal property, and of, to wit, the trust properties and estate as they may exist at any and all times during his natural life; and also with respect to the personal property hereinafter described (including any and all changes thereof, by investment, reinvestment, exchange or otherwise) to pay to or apply to the use of said Harry F. Woods, such amount or amounts from or out of the principal or capital thereof, as the trustees of the trust may determine, at any time, to be necessary for any special purpose personal to said Harry F. Woods; their determination as to such necessity at any time to be in the unrestricted and absolute discretion of said trustees. Said trust to be subject to the payment of $50 per month to Mrs. H. E. Robinson, during widowhood aforesaid.

(C) Upon and after the death of the said Harry F. Woods, should he leave a wife and lawfully begotten issue surviving him, or should he leave lawfully begotten issue surviving him, to pay or apply out of the net income of the trust properties and estate then remaining (and after allowing for and deducting the expenses of the trust, and trust properties, and trust management, including such amount as in their discretion they may deem a reasonable reserve fund for ordinary or anticipated expenses of preserving and protecting the trust properties, as follows, to wit:

First—To pay from month to month to the surviving wife of said Harry F. Woods (or in the discretion of the trustees to apply to her use or order), while she remains the widow of said Harry F. Woods, and not otherwise, the sum of one hundred and fifty dollars ($150); provided, that if the net income for any particular month or months (after allowances and deductions, as aforesaid) is insufficient to pay said sum of $150, then to pay to her or apply to her use or order the whole of such net income for such deficiency month or months.

Second—Upon the remarriage of said surviving wife of Harry F. Woods, or if she shall die not having remarried, then upon her death, all her rights aforesaid, and all her

rights under this trust, shall ipso facto cease; and thereupon (and previously, if in their absolute discretion, they shall see fit), or should the said Harry F. Woods die without a wife surviving him, but leaving lawfully begotten issue, the trustees of this trust shall, from and out of the net income (after the allowances and deductions aforesaid) pay to or apply to the use of the lawfully begotten issue of said Harry F. Woods who survived him, or to those of such issue then surviving, and the lawfully begotten issue of any of such issue who may die subsequent to said Harry F. Woods, such sum, from month to month (or other convenient or advisable period), as may be necessary or proper for their respective care, maintenance and education, taking into consideration their station in life and the value of the trust estate, and to be for their respective personal and exclusive use and benefit, until such period of time as the youngest of the issue of said Harry F. Woods who survived him, who attains the age of twenty-six years, shall attain such age of twenty-six years (the intention hereby being, for example, that if said Harry F. Woods should leave surviving him three issue, and one of them should die before attaining the age of twenty-six years, then until the younger of the other two issue shall attain the age of twenty-six years, and if two of said three issue should die before attaining the age of twenty-six years, then until the third of such issue shall attain the age of twenty-six years; and if said Harry F. Woods should leave more than three issue surviving him, a like construction as given for the supposed case of three issue surviving).

Third—To accumulate all income undisposed of for the benefit of the surviving issue of said Harry F. Woods, and to wit, those issue of said Harry F. Woods, who survive and are entitled to take upon and after the termination of this trust, according to their respective rights and shares; and such accumulation to continue until the termination of this trust.

Fourth—This trust (meaning the trust in the event of said Harry F. Woods dying and leaving issue, or a wife and issue

surviving him) shall terminate and expire when the youngest of the issue of said Harry F. Woods who survived him, who attains the age of twenty-six years, shall attain such age of twenty-six years (following the construction hereinabove given by way of illustration, under subdivision "2nd" of division (C) of the trust adjudged as in the trustees, distributees in trust.

Fifth—Said trust to be subject to the payment of $50 per month to Mrs. H. E. Robinson, during widowhood aforesaid.

As to this last clause it was determined by the said decree as follows: "That as to the annuity aforesaid, provided in testator's will to be paid to Mrs. H. E. Robinson, to wit: Fifty ($50.00) dollars per month during her widowhood, the same and the payment thereof are a first charge upon and against the net income derivable from the aforesaid trust." (See pages 13 and 14, Decree of Distribution.)

This finding and decree eliminates from further consideration the items as to this annuity, as clearly chargeable upon the net income. It appears, however, that some portion of this annuity was paid by the trustees out of the capital, and the explanation of this partial payment is made on pages 154 and 155:

"The calculation in the present accounting, for each of its four Trust Years, as to what is the apparent Net Income of this Trust, namely the rights of the Income Beneficiary, is in exact accordance with the method of calculation, and provisional determination by the Trustees, pursued and presented in all previous Accountings herein, following the First Annual Account, and the aforesaid settlement of said First Account. This will be apparent by reference to the Schedule, page 143, of the annexed Accounting, where every classification of charges and expenses of the Trust Properties, and of the administrative expenses of the Trust is clearly stated and separated, and the amount and proportion thereof which is charged, assessed or apportioned as to Income Rights. As will be seen by reference to said Schedule the charges against Income rights there made follow the ruling of this Court made

on the settlement of the First Annual Account, hereinabove stated with particularity as between "Income" and "Capital" rights (pp. 152–153, above). There is one exception to the statement last made, and that exception has been already noted and particularly referred to and discussed, namely, the annuity to Mrs. Robinson of $50.00 per month. The rights of said annuitant for the entire period, beginning with the date of said disaster, April 18, 1906, to the terminating date of the present Accounting, six years, 2½ months, have been wholly paid during the four Trust Years of this Accounting. The total of the payments to said annuitant aggregates $3375.00; and the explanation of their elimination by the Trust bookkeeper as a charge against the Income Rights lies in the fact that the first payment of $600.00 to said annuitant which appears in this Accounting was so paid her pursuant to the instructions and order of this Court on the settlement of the last Accounting herein, the Seventh Annual Account, and that the Court in directing the Trustees to make said payment of $600.00 ruled that it should be charged against 'Capital' rights in view of the nonexistence at that time, and from April 18, 1906, of 'normal conditions' in the Trust and Trust Estate. The Trust bookkeeper in the Schedules to the present Accounting where apparent Net Income is arrived at for each of the four Trust Years has assumed that the ruling of the Court on the direction to make said first payment of $600.00 and the reasons for such ruling are extended to all the other payments to said annuitant, during the period of this Accounting, which aggregate with said $600.00 payment the sum of $3375.00. Whether or not the ruling should be so applied and extended is a matter for determination by this Court on the hearing and settlement of the present Accounting. This question, and the facts as to such payments, have been already noted hereinabove in another connection, to which reference is now made (pp. 128–129, in note there, and pp. 34–35, above). The Trustee, H. A. Hedger, claims the amount of said $3375.00 should be charged against 'Income' rights.''

Trustee Hedger is right in this regard. The ruling of the court in view of the decree of final distribution, was clearly contrary to the terms of the trust as defined in said decree, and was a judicial inadvertence based upon the fact that at the time of the settlement of said account there was no controversy as to the items thereof; and, while it is final as to that account, it is not now binding upon the court. It was erroneous, but, having been acquiesced in by the parties to the settlement, it is not now a subject of review, except for the purpose of correction in the account now before the court. It may be said, in this connection, that while such accounts unchallenged at the time are unaffected after the term for appeal therefrom has passed, yet finality as to the adjudication of such former accounts may not be predicated with reference to their effect upon the future. Such settlements affected only the items contained in the accounts for the period. The accounts were unopposed, agreed to by all concerned, and the court had a right, if it was not its duty, to assume their accuracy and rely upon the good faith of the attorney, himself a trustee, under whose direction the accounts were prepared, and who framed the decree and procured the signature of the judge thereto. No finality attached to this act, except as to the contents of the particular account, for it is a settled rule of law, as Mr. Lyons says on page 36 of his oral argument, that a judgment in one proceeding cannot control judicial action—the judgment—in another and independent action or proceeding; and manifestly every separate accounting is an independent proceeding, distinct from every other accounting, past or future (Estate Marshall, 118 Cal. 381, 50 Pac. 540, McFarland, J.; Estate Grant, 131 Cal. 429, 63 Pac. 731); but, even if this were not so, the attorney inserted industriously a provision to this effect, in several accounts:

"That neither the findings hereinabove nor this decree should or shall be considered or deemed or taken as binding

or conclusive, either by way of a precedent in the trust or as res judicata, as to any items, charges, allowances, claims or rights in any future accounting by the trustees of said trust, which may be the same or similar, as to subject matter, or as involving, or apparently involving, the same or similar or analogous questions or considerations, whether of fact or law, as the items, charges, allowances, claims or rights (or any of them) referred to, found, or determined, by the hereinabove findings of this decree; excepting only the finding and determination as to the trust properties in the possession or under the control of said trustee on June 30, 1904; provided, nevertheless, that this decree is intended to be and shall be· taken as definite and conclusive as to the period of the aforesaid present accounting, and the administration of said Frank H. Woods Trust during said period.''

Even if this provision were not inserted in the decree the law would have read it in, for the supreme court has so decided; and that point is not here contested by the third trustee, for he asserts no right to question any expenditure, or any act, that has been already approved by the court; but he claims to be entirely within his rights to refuse to accede to any item or act of the other trustees, so far as these accounts are concerned, that he deems to be prejudicial to any beneficiary of the trust, and he does not consider as a sufficient reason why he should do so the fact that similar accounts may have passed the court on a former settlement when no opposition was made and no controversy had, in the matter now before the court, which should be free from any complication or confusion by reason of former adjudications which applied solely to the matters then cognizable by the court. The items to which he particularly objects as proposed to be charged against the capital which he thinks would be improperly so charged are as follows:

| | |
|---|---:|
| Taxes | $81.48 |
| Interest on trust indebtedness | 30,927.62 |
| Annuity to Mrs. Robinson | 3,375.00 |
| Strohm settlement | 760.00 |
| Masonic Cemetery Association | 36.00 |
| Two-thirds of insurance premiums | 4,563.07 |
| Expenses of annual report | 28.25 |
| One-half of expenses of administration | 9,375.63 |

Amounting to a total of..................... $49,147.05

The third trustee insists that so far as this court has upon any of its previous settlements ruled approving the charge of any of these different items, it has done so without the presentation of any controversy upon the subject, and, as before stated, upon the express reservation that the question should not be thereby foreclosed against discussion upon any subsequent settlement.

Mr. Lyons, in his oral argument, admits that it is true that this provision that the court should not be bound in any future accounting by its decision upon the particular account then settled; but, he says, that such a provision is merely ex industria, and indicates no more than a not uncommon superfluity having its origin in overabundant caution; for taking the provision as a whole, it merely states an established principle of law, as hereinabove recited; and he imputes argumentatively another possible intention to this provision.

In order to make clear this phase of Mr. Lyons' argument, it is here transcribed from pages 36, 37, and part of 38:

"And yet this ex industria provision may have also intended to indicate—and in all probability it did so intend— that future accountings might disclose facts and circumstances as to disbursements made, or expenses or obligations incurred, which the court might or might not conclude as falling within any of the classifications of disbursements and expenses theretofore made on the previous accountings; or that a different condition of the trust affairs, and trust assets,

as a whole, or otherwise, might present itself. Such a situation as the one last suggested came to pass as the result of the disaster in San Francisco of April 18–21, 1906; and that situation, in its general aspect, has continued throughout the six trust years following the disaster which marks the terminating date of this accounting, June 30, 1912, as the majority report fully shows.

"But irrespective of the effect of this ex industria provision—and its effect and purpose, it is believed, are as above stated—this cannot alter or diminish the fact, or the logical effect of the fact, that on five separate adjudications this court, and the same judge in each instance, determined with precision and by specific illustration the method by which the amount of 'Net Income' for each trust year should be arrived at (for 'normal conditions'); and on each of these five adjudications the expressed method, and its various elements, were the same. Indeed, there are seven instead of five separate adjudications in support of the method for determining 'Net Income' under 'normal conditions'; for the action of the court on the settlement of the sixth and seventh annual accounts, in its 'adjustment' of net income for the two trust years immediately following the disaster, did so on the ground, apart from the special agreement with the beneficiary (or as a part of the 'equities' involved in the agreement), that 'normal conditions' ceased upon the disaster of April 18–21, 1906, and continued nonexistent, thus recognizing, and necessarily affirming, its rule laid down in its five separate adjudications, up to the time of the disaster, as the proper and settled one in the case of 'normal conditions.'

"It appears clear, therefore, that this court has decisively established how 'Net Income' should be determined under 'normal conditions,' and that Trustee Hedger's efforts to have this settled rule set aside and disregarded at this late date is a futile attempt, and nothing less than an impeachment of the court's solemn judgment on seven different occasions. As a matter of fact, however, the rule for determining 'Net Income' under 'normal conditions,' does not arise on this

accounting, as already noted, for two reasons: First, the absence of 'normal conditions'; and, second, the special agreement with the income beneficiary—the same two conditions which formed the basis of the court's adjustment on the last preceding accounting herein. But, in view of the attack by Trustee Hedger, on the established rulings of the court as to net income under 'normal conditions' we have thought it proper to set forth the facts and considerations above stated, and those to be presently noted. In the determination of how 'Net Income' should be arrived at under 'normal conditions,' the court in its numerous and uniform adjudications was called upon to adjudge how the various items of disbursements and expenses as to the trust properties and the administration of the trust, should be assessed—whether to 'Income' or 'Capital,' or in part as to each. It determined this matter with great precision, based on the character and nature, of each item, as reflected by its benefit to capital or income, or to both; and taking into consideration, as to some of the items, the objects and purposes of the Trust, and the rights. of the persons interested—'Capital' and 'Income' rights— and the duties of the trustees as representing all those rights; their duty to protect all such rights, and to administer the trust conformably to that duty. Accordingly the court assessed certain classes of disbursements and expenses against 'Income,' wholly, and apportioned certain other classes between 'Income' and 'Capital,' each to bear a specified proportion determinable by the legal character of the expense. Most of the usual charges and expenses were assessed wholly against 'Income,' and the remainder apportioned—in one class of cases two-thirds to 'Capital' and one-third to 'Income' ('permanent improvements' to realties, but not 'repairs'; and insurance premiums as to improved realties), and in the other class one-half to 'Income' and one-half to 'Capital' (all administrative expense of the Trust).''

As to the special agreement alluded to in the foregoing extract, and also referred to in the same argument on page 4, as a ''solemn contract'' between the then trustees and the

income beneficiary, as approved by this court in the settlement of the fifth, sixth, and seventh annual accounts of the trustees of this trust I have failed to find in the record any authenticated executed instrument constituting a solemn contract; but, there is what purports to be a quotation therefrom on pages 10 and 11 of the argument, copied from pages 30 and 31 of the Report to the Seventh Annual Account, as follows:

"That by reason of the disaster on said April 18, 1906, and the fact that all the improvements on the real properties were wholly destroyed, and the income on some of the personal property discontinued, more than three-fourths of the gross income of the trust was swept away, the rents from the real properties alone representing nearly three-fourths of the entire gross income of the trust, being a sum of $47,000 annually, at the time of said disaster, out of a total gross income of between $63,000 and $64.000.

"In these circumstances and to save the capital of the trust, and the interests of the 'Capital' from great losses which must ensue if sales of the realty or personalty had been insisted upon by the income beneficiary, the special arrangement and agreement set forth in said two last accountings (and reports therewith) were made with said income beneficiary.

"Under this arrangement and agreement the trustees were and are enabled to hold said properties until such time (if possible) as normal conditions in San Francisco might come about and a fair price be obtained for such properties as might ultimately have been sold or be selected as advisable to sell; in the meantime raising money to finance the trust affairs and carry out such building operations and other rehabilitation of the trust assets as might be deemed advisable and found possible of accomplishment.

"Such agreement with the income beneficiary involved the obligation of the trust and the stipulation of the trustees that said beneficiary's income rights in the properties so held should be deemed preserved and protected, the amount of

such income rights from time to time—annually or otherwise—to be fixed or adjusted between the trustees and the beneficiary, or by or with the advice of this honorable court.

"By similar agreement with the income beneficiary entered into long before the disaster of April 18, 1906, the capital of the trust benefited in a very large amount as to a valuable item of personal property which had become nonincome producing and continued to remain such for more than twenty-nine months; and at the same time the rights of the income beneficiary to his lost income were restored to him upon the ultimate transaction which resulted in such an important benefit to the interests of the capital.

"Under the arrangement aforesaid with the income beneficiary as to properties held since April 18, 1906, the effect has been, up to this time, to deprive the income beneficiary, for the time being, of a tremendous amount of income, leaving the actual income—especially the net income—to be of such comparatively small amount as to be inadequate for the wants of said beneficiary and his family, considering their station in life and the obligations and requirements thereof. It has become apparent at this date that some different arrangement will have to be made in justice to the income beneficiary, as to adjustment of net income on the settlement of the annual accountings herein."

Mr. Lyons says, in his argument, "as will be noted in the quotation just made, the agreement of the trustees of this trust with the income beneficiary, Mr. Woods (approved and acted upon by this court, as already noted), is clear in its terms, and specific as to its intent as regards the income beneficiary. It involved the obligation of the trust and the stipulation of the trustees that said beneficiary's income rights in the properties so held should be deemed preserved and protected, the amount of such income rights from time to time—annually or otherwise—to be fixed or adjusted between the trustees and the beneficiary, or by or with the advice of this honorable court."

"In the settlement of the aforesaid seventh annual account, adopting the suggestions of the trustees, of the typed report to that account, they leaving the adjustment to the court upon the suggestions therein made, this court basing its action upon said agreement, the income beneficiary consenting, fixed and adjusted the net income, or income rights, of the beneficiary, for the two trust years following the great fire of April 18–21, 1906, namely the period comprising July 1, 1906, to June 30, 1908, inclusive, at $32,850 per annum. The present four years' accounting begins with the terminating date of the two trust years so adjusted on said seventh annual account."

It is clear, therefore, argues this counsel, that the previous court adjustment of $32,850 per annum, would be prima facie, applicable as a proper "adjustment" of income rights for the four trust years of the present accounting. Indeed, the amount of the former "adjustment" might properly be increased to a considerable sum in excess of $32,850 per annum, if the equities of the "facts and circumstances" of the four years of the present accounting are considered in any "adjustment," as they must be if the agreement be insisted upon by the income beneficiary—for any "adjustment" must be predicated upon the "equities" apparent during any trust year or trust years, as in no other way may the rights of the income beneficiary, in view of his agreement with the trustees, be arrived at; and it may be noted that, under the terms of the agreement the adjustment could be had directly between the "trustees" and the "income beneficiary," but, as also provided by the agreement it might be left to the court itself, viz., "to be fixed or adjusted between the trustees and the beneficiary, or by or with the advice of the court."

The "adjustment" was left to the court on the previous accounting, by mutual consent of the (then) four trustees of the trust, and the beneficiary; as it is now likewise left, as to the present accounting, by the majority trustees and the beneficiary (there being now but three trustees, the third and minority trustee having become a trustee since said previous accounting).

The "equities" disclosed by the present accounting, for determination or "adjustment" of income rights, as per said agreement, are set forth in the typed "Report" of the majority trustees, not merely specifically as to the facts and circumstances of the trust affairs during the four years' period of this accounting, and before that, covering the period beginning with execution of the agreement—immediately following the disaster of April 18–21, 1906—but with the greatest elaboration as to those facts and circumstances.

The burden of this argument rests upon the validity, tenor, force and effect of the special agreement which the majority trustees claim has at all times to this date been in force and acted upon and is conclusive upon this court, according to its repeated rulings, in former accounts. Trustee Hedger says that this agreement so called is at best vague in its terms and, therefore, not legally or equitably enforceable for any precise or fixed quantity, figure or percentage, and, quoting from Trustee Hedger, on pages 195 and 196 of the typewritten report to the present accounting, assuming that the agreement, as made, was within the powers of the trustees and properly made by them in the best interest of the trust, nevertheless the income beneficiary has, before this, received full and complete compensation for everything due him under the agreement pursuant to its spirit.

In this regard it must be borne in mind that the disaster of 1906 destroyed a large portion of the capital of the property; and although this portion of the capital destroyed was all of the income-producing part of the real property, and a greater loss therefore to income than to capital, it was nevertheless at the same time a reduction of the capital to the extent of the property destroyed, and it resulted also in a change of conditions to which no measure of antedisaster conditions could be applied. In the then unusual condition of affairs, the income beneficiary was entitled, as a matter of course, to call upon the trustees to sell or mortgage some part of the trust property for the purpose of improving other parts, or investing the proceeds in income-producing property; but

these rights on the part of the income beneficiary were not absolute to the extent of requiring an immediate sacrifice of any of the capital; and if they had been, it would have resulted in further loss to the income interests as well as further loss to the capital interests; and refraining from sale at a time when a sale could not have been made without a sacrifice (assuming this to have been the case), was therefore not only something which it was the trustees' duty to do, having regard to the interests of income and capital alike, but which the income beneficiary would necessarily have approved, if only as a measure in his own interest. Taking compensation, therefore, from the capital interests, for his consent to an act, which act was the duty of the trustees without reference to his consent, is asking something from the capital for which it has not received any consideration from him. If the contrary view be considered the correct one, then we have only to reflect for a moment to see that, if the agreement had not been made, and the beneficiary had insisted upon an immediate sale of a portion of the real property and the devotion of its proceeds to the improvement of the remainder, he would not have received any income whatever until that improvement had been accomplished, and his income then would have been on a very materially diminished quantity of capital. Either this is so, or the benefit claimed to have been gained by the capital has not resulted from his agreement.

Mr. Lyons says, on pages 33, 34 and 35 of his oral argument that the answer to this suggestion of vagueness in the terms of the agreement is obvious and conclusive.

It is found, first, in the plain terms of the agreement, already quoted, apart from its object, intent and purpose, which give its clear interpretation if there were any vagueness in its terms; and, second, in the action of this court in the settlement of the seventh annual account, which forecloses any suggestion of vagueness in its terms or any misunderstanding as to its object, intent and purpose.

The answer to the other suggestion for disregarding the agreement is equally obvious and conclusive. What the income beneficiary has received "before this," "under the agreement," was received under the court's settlement of said seventh annual account. That settlement only related to the period to which it referred, the two trust years July 1, 1906, to June 30, 1908, inclusive, immediately following the disaster. It could not relate, and did not, of course, purport to relate, to any subsequent period, as any such subsequent period was not and could not have been before the court on the settlement of the seventh annual account.

The agreement has remained in force during the entire period of the four trust years of the present accounting, and the holding, handling and administration of the trust properties during those four trust years have been in accordance with and in enforcement of the rights of the trustees stipulated by the income beneficiary under that special agreement with him. All this has been attempted to be brought to the attention of the court by what has been stated hereinabove; and the truth of it has been fully set forth, explained, and illustrated in the majority report of the trustees, and the elaborate statement of facts and circumstances in that connection. No denial of the statements in the last two sentences may be justly made by anyone—trustee, beneficiary, or other; and if there be anything in the report of the minority trustee which may be construed as a denial it is not in conformity with the verities of the matter.

Therefore, if it was proper by this court on the settlement of the seventh annual account of the trustees—the last preceding accounting—to accept and adopt the said special agreement with the income beneficiary, as the basis for the determination and "adjustment" of his income rights, it is equally proper for the period of this accounting to make a determination and an "adjustment" of the rights of the income beneficiary on the same basis of that special agreement.

It is proper to note here that the necessity for action by the court on this special agreement will cease on the present accounting; for it is stated in the majority report to this accounting that "normal conditions" have apparently been reached, as to the real assets, at the terminating date of the present accounting, June 30, 1912.

Trustee Hedger, as already indicated, also opposes the correctness of the presentation of income rights apart from said special agreement. This is the presentation made in the account itself—the schedules to the account, pp. 142, 143—already noted as made in accordance with the uniform rulings of this court, beginning with the decree of settlement of the first annual account up to the time of the said disaster, the settlement of the fifth annual account (following which the said special agreement became operative). His opposition in this regard, is as unfounded, it is respectfully submitted, as is his attempt to have the court disregard the said special agreement with the income beneficiary. The desire, or at least the contention, of Trustee Hedger, is that the solemn adjudications of this court, beginning with the settlement of the first annual account and reaffirmed in the settlement of the four succeeding annual accounts—following which the "Special Agreement" intervened and "normal conditions" were suspended—should be now disregarded and set aside, so far as those five separate adjudications determined the method for determining "net income."

It is submitted that Trustee Hedger's attempt just stated should be judicially considered as exceeding any just expectation of successful accomplishment. The five separate adjudications of the court referred to—which, of course only concerned "normal conditions"—should be sufficient as establishing a rule in this trust for the determination of "net income" under "normal conditions"; especially when the matter is presented to the same judge who has considered and decided every question arising in the trust affairs during the eleven years' existence and administration of the trust. These five separate adjudications must certainly be considered

as laying down a settled rule for "normal conditions," as to
the method of arriving at "net income," where the character
of items involved in that question is the same as those passed
upon in each of those five adjudications, namely, the classifica-
tion of items specifically defined and distinguished by the
court, and hereinabove set forth.

The court has been liberal in making quotations from the
two reports and from the oral argument in support of the
report of the majority trustees in order to present fully,
and at the same time as concisely as possible, the essential ele-
ments of the differences which the court is requird to dispose
of in connection with the settlement of the present account,
these differences comprising the effect of the agreement or
arrangement, between the trustees on the former accountings
and the income beneficiary; and the apportionment of certain
expenses as between capital and income. The views of the
majority trustees have been set forth, as their counsel says,
with the greatest elaboration as to all the facts and circum-
stances. Indeed, it is difficult to imagine any presentation
more elaborate and analytical than the statement of the
report of the majority trustees and the oral argument in sup-
port thereof, which deserve the commendation in the letter
to Mr. Lyons from the income beneficiary and cotrustee, in
which after stating shortly his view of his rights and his
sacrifices on behalf of the capital, he says (p. 220, Report):

"I have not figured up all the benefits to the capital, but
if you should make your report to this account in the same
elaborate and analytical manner as you have done in pre-
paring the reports to all previous accounts in the trust, I feel
that perhaps you may be able to disclose by exact figures
what these benefits are. The very appraisement of the assets
of the trust made by three appraisers as to the values n
June 30, 1912, shows in itself the great benefits that have
accrued to the capital under the agreement made with me by
which properties were allowed to be withheld from sale."

This letter, in connection with the report of the majority
trustees and the oral argument of their attorney, exhibits one

of the difficulties in dealing with this subject matter. The income beneficiary, a trustee, and his attorney, also a trustee, who was also the attorney for the board of trustees on former accounts, and on this accounting the attorney for the majority, consisting of the income beneficiary and himself, occupying a position that may conflict with the interest of the remaindermen. To say that this condition is not probable in this case is not to the purpose, for it is possible in this, as in any other case. The mere fact that the income beneficiary is the sole heir at law and that the remaindermen are his children, does not alter the legal situation. In his letter, already quoted from, he says:

"I am very much embarrassed about asking the court to protect my strict rights since the fire under the plain terms of the agreement made with me, because as you know from the beginning of the trust I have thought more of the capital rights—they are my children—than I have of my own rights, and my desire and my action also has always been to do everything to advance the interests of the capital. If I should insist on my strict rights under this agreement it would require that a very considerable sum be paid to me in view of my lost income rights for the six years ending with this account—that is, up to June 30, 1912; but as I have said I am embarrassed in making up my mind whether I should do this. If I should do so I do not see how any just complaint could be made by anyone, and I feel certain that my children would not do so, because under the agreement made with me following the fire, the interests of the capital in the real properties have been brought up to almost normal values, and the tremendous depreciation that the Spring Valley stock suffered has been avoided, by being able to hold it, and the capital as to that matter alone has received a very large benefit."

The suggestion in this letter as to the writer's embarrassment in making up his mind whether he should insist on his strict rights, under the special agreement, is in accord with the intimation of the majority trustees on page 176 of their

report, that it may be that the income beneficiary will be reluctantly forced "to claim his technical rights under his agreement aforesaid with the trustees, providing 'that said beneficiary's income rights . . . should be deemed preserved and protected.' ". It is pointed out by the minority trustee that while the income beneficiary, in his capacity as such, and himself and his cotrustee as such, deny the right to question the binding effect of former adjudications, they assert his and their right to disregard such adjudications if they can give the agreement a meaning and effect which would yield him larger results. There might seem to be some inconsistency in this attitude of the majority trustees, one of whom is the income beneficiary and the other his attorney and cotrustee. Trustee Woods, who is also the income beneficiary, prays for the settlement of the account as presented, and yet, in his letter, says that he does not mean to waive his greater rights under the special agreement made between the trustees and himself following the fire.

In this connection, incidentally, it may be serviceable to advert to the distinction drawn by Mr. Lyons in his oral argument between an income beneficiary and a life tenant. The court has just described the children as remaindermen, which, technically, means those who are entitled to the remainder of the estate after a particular estate carved out of it has expired, so that strictly this may be a misnomer; so with the term "life tenant." On pages 39 and 40 of Mr. Lyons' oral argument, in commenting upon the position of Trustee Hedger as to income rights, he says that it would seem to rest upon the rule for determining net income in the case of a life tenant of a legal estate—for his separate report refers to the income beneficiary, Mr. Woods, throughout, as a "life tenant." But the case at bar as to income rights is not that of a "life tenant," much less that of a life tenant of a legal estate. We have here a "trust"—a statutory trust, and the simple fact of such a trust stands opposed to any theory involved in the rights of a life tenant of a legal estate. The latter has powers and rights, and an estate,

which is not at all predicable of the income beneficiary of a statutory trust. A legal life tenant has not only an actual estate against all the world, in the property or properties of which he is life tenant, but the nature of his estate is such that he is in effect the owner of the properties during his life, excepting that he cannot dispose of them. And so he has unrestricted power and right to manage and handle the properties as he sees fit, save only that he cannot commit waste as to the inheritance. On the other hand, an income beneficiary of a statutory trust is destitute of any estate, and of any such powers and rights of ownership. He has "no estate or interest in the property, but may enforce the performance of the trust." (Civ. Code, 863.) And of course he has no power of any kind in the management or handling of the trust properties, or the administration of the trust or its affairs; and while he may complain, if he deems the occasion requires, that the trustees are not carrying out the "trust" in accordance with, or having just regard, for his rights, and may invoke the court's aid to "enforce the performance of the trust," the "performance" still remains with the trustees—the management and handling of the trust assets, and the administration of the trust and trust affairs generally, and in every particular.

In answer to the assertion that this is not a case of life tenant and remainderman, and that the rules applicable to such relation are not to be applied here, attention is called to the language of the trustees in their fifth report, page 31, wherein the income beneficiary is described as in effect a life tenant. It should seem, therefore, that the majority trustees hitherto have drawn no such distinction as is now asserted, in principle, between the income beneficiary and a life tenant, but, on the contrary, have treated both, for the purpose of these accountings, as the same; and one of the authorities, cited by the attorney for the majority trustees, seems to support the view that the terms, if not identical, may sometimes be used synonymously, for that authority says:

"A trustee should pay all taxes legally and rightfully imposed upon the trust estate, for defraying which he should resort to the income rather than the principal, or the estate of the life tenant rather than to that of the remainderman": 28 Am. & Eng. Ency. of Law, 2d ed., p. 1055.

Reverting to the special agreement so repeatedly asserted by the majority trustees as affirmed and ratified and adjudicated by the court, and thereby constituting a rule of decision for all subsequent accountings during the existence of certain conditions referred to therein and described as a solemn contract between the trustees and the income beneficiary of an inviolable character, and so in effect determined by this court in the settlement of the fifth, sixth and seventh annual accounts of the trustees of this trust, the power of the trustees to engage in any such agreement or arrangement as it is described by the attorney in his oral argument, and on page 136 of the majority report, may be questioned. So far as the court recalls, no formal document of the character described was ever submitted to the court, and assuming that they had the right to enter into any such arrangement or agreement, there is no explicit evidence of its contents and execution, except the fact that its supposed substance was adopted and ratified by the court in the settlement of several accounts. See page 48 of the Report of the Majority Trustees on this account. See, also, pages 10 and 11 of Mr. Lyons' oral argument, in which he says that this agreement, approved and acted upon by this court, is clear in its terms, and specific as to its intent as regards the income beneficiary; and that it involved the obligation of the trust and the stipulation of the trustees that said beneficiary's income rights in the properties so held should be deemed preserved and protected, the amount of such income rights from time to time—annually or otherwise—to be fixed or adjusted between the trustees and the beneficiary, or by or with the advice of this honorable court.

On the other hand, counsel for the minority trustee characterizes this arrangement as vague and ambiguous, even if it

were within the power of the parties to undertake to make the "income rights" of the beneficiary any greater than they already were under the law and the terms of the instrument creating the trust. This counsel asserts that so far as this agreement being clear and specific in its terms, and as to its intent, there is nowhere any explicit statement of such terms, but everywhere the same vague, elastic description of it as an "arrangement and agreement" under which "the trustees were and are enabled to hold 'said properties until such time (if possible) as normal conditions' might come about," and which "involved" somehow "the obligation" somehow created "of the trust, and the stipulation of the trustees" that the income rights, whatever they are or may be, "should be deemed preserved and protected"—something, of course, legally obligatory on the trustees without any express stipulation therefor on their part. The agreement referred to is stated to have been an agreement that certain properties should be withheld from sale at a sacrifice and that in the meantime the life beneficiary's "income rights" should be preserved. In his points and authorities, this counsel says, that no attempt is made in the agreement to define these "income rights," but it is assumed, in the majority report, that they included the right to insist upon an immediate sale at a sacrifice of all the unproductive property, and the investment of the proceeds in productive property. He asserts that it was shown on the oral argument that no such right as this existed, and that the assumption of its existence was fallacious, as were also other assumptions of the majority report, in the same connection, to wit, that the proceeds of sales would not have been judiciously invested; that sales could have been made and proceeds invested without loss of time, if insisted on by the income beneficiary; that such a course would have been of advantage to the income beneficiary, and would have placed him in the continued receipt of the income enjoyed before the fire; that the existence of the agreement was entitled to credit for the improvement in the value of the Spring Valley stock, any more than for the

loss in value on securities of Ocean Shore or United Railroads.

This counsel claims also that the agreement or arrangement had been at least fully performed on the trustees' part, and that the income beneficiary has received more than all he could possibly claim thereunder, and in support of this assertion, he adduces certain figures which need not be here repeated. He admits that the payment of what the income beneficiary has received before this has been approved by the court's decrees of settlement of the accounts showing such payments; but the quantity and sufficiency of such payments remain the same nevertheless; and if the income beneficiary has been thereby already overpaid, that is not a good reason why such overpayment should be continued.

With reference to the finality of the former accounts, as to the items contained therein, sufficient has been said by the court, and the court does not understand that counsel disputes its conclusions or denies the appositeness of the authorities cited.

The only questions reserved in this accounting are concerning the alleged agreement between the trustees and the income beneficiary, and the apportionment of certain expenses between capital and income.

It is strenuously contended by the majority trustees, as such, and by the income beneficiary, as such, and their counsel, as such, that this court is irrevocably committed by its settled rulings to the legal validity, virtue and effect of that agreement, according to their construction, and that they had a right to fix and adjust the amount of the income rights—from time to time—either between themselves, or by or with the advice of the court. This contention involves the assumption that they need not have recourse to the court in the first instance, but may act of their own motion in making an oral or written agreement affecting the terms of the testamentary trust, which is the sole source of their existence, authority and power, and a limitation upon their official faculties, relying upon the subsequent sanction or ratifica-

tion of their act by the court, under whose supervision they are supposed by the law to conduct their trust. The justification for this assumption is based upon the unusual conditions which followed the fire of 1906, which brought into operation considerations of equity on account of the great losses suffered by the income beneficiary, in the deprivation of his revenue under the trust, and that, therefore, the trustees had the right to agree with him so as to restore, as far as possible, his losses. The equitable considerations, upon which the judgment of the court is now invoked, and which are said to have influenced its rulings on the former accounts, are set forth at some length in the oral argument of Mr. Lyons, on pages 18 to 21. The losses incurred by the income beneficiary were those suffered by all the people and property holders of this city, in a common calamity, and involved many trust interests, life tenants, income beneficiaries, remaindermen, as well as individual proprietors; but these incidents of the disaster did not change the rules of law respecting species of tenure. There is no reason why, in the estimation of this court, any rule should apply to one case rather than to the others, unless there be some exception based upon the language of the instrument upon which the rights of the claimant are dependent; that instrument is incorporated in the decree of final distribution in the estate out of which this testamentary trust arises, which decree, in so many words, gives the income beneficiary the entire net amount of the rents, issues, profits and income of said real and personal property, and of, to wit, the trust properties and estate as they may exist at any and all times during his natural life; and also with respect to the personal property hereinafter described (including any and all changes thereof, by investment, reinvestment, exchange or otherwise) to pay to or apply to the use of said Harry F. Woods, such amount or amounts from or out of the principal or capital thereof, as the trustees of the trust may determine, at any time, to be necessary for any special purpose personal to said Harry F. Woods; their

determination as to such necessity at any time to be in the unrestricted and absolute discretion of said trustees.

The majority trustees, in their report, on page 151, say, that upon the settlement of the first annual report of the trustees, this court was called upon to determine what were the income rights of the income beneficiary under the trust, "which provides that he shall receive all the income of the trust properties and trust estate, subject to the annuity of fifty dollars per month to Mrs. Robinson." There is an inaccuracy in this quotation. The trust does not provide that the income beneficiary shall receive all the income, nor does the decree so recite, but, by its exact terms, distributes the property to the trustees, in trust, to pay or apply "the entire net amount of the rents, issues, profits and income," to the use of the income beneficiary. Instead of receiving the gross, or all the income, the trust provided he should receive the net income only, and it was conceded in the oral discussion that if the word "net" had been omitted, he would still be entitled to no more than the net income. Net income is "the income derived from the whole property, less the necessary expenses incurred in its management, and disbursements incurred on account thereof": 29 Cyc. 671. This correction is necessary in order to emphasize the distinction between the terms said to be responsible for this controversy.

The majority trustees, on page 176 of their report, after presenting the case for the income beneficiary, and the figures which show the great loss that would occur to him if their suggestions should not be adopted by this court, say that the views outlined by them, on page 134 of their report, speak now with imperative force, so that the court may, of its own motion, deem it proper to take charge of the matter, in the interests of justice to the income beneficiary, and then there is an implied intimation that unless the court acts upon this suggestion, the income beneficiary will pursue a course in his own behalf to secure the rights to which he believed he is entitled.

This plea, presented so forcibly and imperatively, by the majority trustees, and emphasized by their attorney in behalf of the income beneficiary, would seem to leave no alternative to the court but to adopt the theory of the trustee beneficiary and the trustee attorney, and to confirm the agreement under consideration. It might be remarked collaterally that the remainderman should also be considered as included within the interests of justice, for the majority report seems to be devoted mainly to the rights of the income beneficiary, and the agreement, which the court is called upon finally to uphold, as protecting those income rights. What those income rights were and are must be determined by the instrument creating the trust, and although the court may heretofore have been induced in the absence of contest to pass an account or sign a decree seeming to accept such agreement, such judicial act has no force and effect beyond the settlements which have become final by operation of law, and which did not extend to the accounting now presented, in which it is an open question.

This agreement, presumably the composition of the attorney for the trustees, himself being a trustee, and included in the reports accompanying the other accounts, if approved and acted upon by this court, was so approved and acted upon, as in the case of other matters contained in the reports and accounts, by reason of its faith in the attorney and its confidences in the trustees, and the lack of any controversy as to its validity. In the opinion of the court the agreement was not conclusively acted upon, nor finally ratified, and there was nothing concluded except as to the accounts then presented and settled.

By that agreement, so far as the court understands its terms, it undertook to vary the testamentary trust in an important particular, thus departing from the decree of distribution which established and adjudicated that trust, and which conferred no power to alter it in any particular. Notwithstanding the unusual conditions so insistently relied upon by the majority trustees, it was not competent for anyone to

do this, for, if it could be done to any degree or extent, it might be carried further, and because of circumstances unanticipated and unapprehended by the trustor might lead to the defeat of his intention and the destruction of the trust so carefully designed by him. That this is possible may be illustrated by calculation of the financial effect consequent upon the continuance of the situation now presented to the court for a period within the rules of mortality, which might bring about the absorption of the principal in payment of income on the basis of this agreement; then what would remain for the children?

The discretion which the majority trustees claim was given them by the trust did not extend so far, and the court has no right or power, no more than have the trustees, to invite such a result.

This view of the court renders unnecessary any further consideration of this agreement or arrangement, in connection with this accounting, and brings us to the apportionment of certain expenses as between capital and income, which is the only remaining question.

The agreement aside, all that the income beneficiary can now receive is the net income of the trust property. We have already attempted to define what is meant by "net income," but that definition is sought to be limited or extended by the majority trustees and their counsel, who contend that previous court adjustments would be prima facie applicable as a proper "adjustment" of income rights for the four trust years of the present accounting.

This phrase "net income rights," so much used by the majority trustees, has no significance beyond the import of the expression used by the trustor in his testament and in the decree of distribution. The simple terms "net income" need no gloss or comment to explain their meaning. It is simply "net," not "gross," income, and that is what the income beneficiary derived through the testamentary trust, and no former adjustment, even if not now reviewable, as to the previous accounts, although they were left to the court

by the mutual consent of the then four trustees of the trust and the income beneficiary, can relieve the court in the present instance of the duty of meeting the issue for the first time presented in a seriously contested form.

If this view be correct, then the contention of the majority trustees cannot be sustained by the court; for if the disbursements excepted to by the minority trustee are to be properly considered as necessary expenses incurred in the management of the property, or incurred on account thereof, as distinguished from investments in the property itself, or changes in the character of the capital, then they should be deducted from the gross income to ascertain the net; otherwise not.

We have already dealt with the annuity as determined by the decree of distribution itself.

It is conceded that the taxes upon the unimproved property which produces no income should be paid out of the corpus of the estate; but the ordinary taxes of property in which there is a life estate, and the ordinary expense of the care and management of the principal, are charges upon the life estate, to be paid out of the income: Peirce v. Burroughs, 58 N. H. 302. It is laid down by the authorities that the insurance is a proper deduction from income: 2 Perry on Trusts, 5th ed., sec. 553.

A life tenant is not bound to insure the interest of the remainderman, but each may insure his own interest: Harrison v. Pepper, 166 Mass. 288, 55 Am. St. Rep. 404, 44 N. E. 222, 33 L. R. A. 239; De Witt v. Cooper, 18 Hun (N. Y.), 67. A trustee who holds the legal title for both has the duty of insuring; and accordingly insurance premiums paid by a trustee would probably be universally treated as an ordinary expense of holding and managing the property, and so payable out of income: Bridge v. Bridge, 146 Mass. 373, 15 N. E. 899. The general practice of trustees is to charge insurance premiums to income: Loring's Trustee's Handbook, 2d ed., p. 116.

All of these propositions are simply elementary.

As to the administrative expenses of the trust, to wit: Court and legal costs and expenses, office expenses and office administration, and salaries, trustees' compensation, it is almost universally decided that the expenses of managing a trust should come out of current income. It was held in Spangler's Estate, 21 Pa. St. 335, that the interest and not the principal of a trust fund must bear the expense of administering it. Were it otherwise, the entire principal might be absorbed in paying the trustee's commissions upon income. A trustee is entitled to a reasonable compensation for his services as they are rendered, and unless a contrary intention appear, the compensation must come out of the income of the fund in the administration of which it is earned: Butterbaugh's Appeal, 98 Pa. St. 351.

It was argued in the last cited case and by implication sustained, that as the intention of the trust was to sustain the estate intact for the children, the charges for administration of the trust and for taxes on money at interest should therefore be paid out of the income. If such payments be made out of the capital, the latter will be gradually consumed, and the time may come when there may be no fund left, and consequently no annual income. The children may then claim the whole corpus of the fund and the decree entered in the court below would afford the trustee no protection: Spangler's Estate, 21 Pa. St. 335.

The question as to the payment of the interest on the trust indebtedness, which it is proposed to charge against capital entirely, is not correctly so chargeable, according to the authorities, as the court reads them, for the rule is stated that the equitable tenant for life must pay the interest upon all encumbrances upon the estate, to the extent of the rents and profits: Perry on Trusts, sec. 553.

Interest on an encumbrance on the property, for example a mortgage, must be paid by a life tenant, although it would not be safe for a remainderman as against the mortgagee to rely on the liability of the life tenant to pay the interest: Martin v. Martin, 146 Mass. 517, 16 N. E. 413; Plympton v.

Boston Dispensary, 106 Mass. 544. Similarly, a trustee who places an encumbrance on property, or allows one to remain, should pay the interest out of income. If the trustee pays off the principal of the encumbrance he should pay it out of the principal of the trust fund of which both the life tenant and remainderman are beneficiaries: Martin v. Martin, 146 Mass. 517, 16 N. E. 413; Plympton v. Boston Dispensary, 106 Mass. 544.

If a remainderman pays off the encumbrance, the life tenant must continue to pay interest to the remainderman, or, what is more usual, must pay to the remainderman the present worth of an annuity equal to the annual interest running during the number of years which constitute the expectancy of life of the tenant for life: Moore v. Simonson, 27 Or. 117, 39 Pac. 1105; Plympton v. Boston Dispensary, 106 Mass. 544; 4 Kent, 14th ed., p. *74; Stevens v. Melcher, 152 N. Y. 551, 46 N. E. 965.

In accordance with the principles stated in the foregoing opinion, a decree settling the accounts in question was filed on the 6th day of October, 1914.

MEMORANDUM.—The item of interest on trust indebtedness, $30,927.62, was corrected by the court by subtracting therefrom $2,253.89, making the true sum chargeable in that behalf, $28,673.73.